UNITED STATES *v.* METROPOLITAN PETROLEUM CORP., HERBERT B. MOLLER (No. 4797)[1]

[1] C. A. D. 567

United States Court of Customs and Patent Appeals, May 27, 1954

*Warren E. Burger,* Assistant Attorney General (*Richard E. FitzGibbon, John R. Benney, Richard H. Welsh,* and *Alfred A. Taylor, Jr.,* special attorneys, of counsel), for the United States.

*Sharretts, Paley & Carter (Joseph F. Donohue, Louis J. Paley,* and *Howard C. Carter* of counsel) for appellees.

[Oral argument April 6, 1954, by Mr. Benney and Mr. Donohue]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

COLE, Judge, delivered the opinion of the court:

A quantity of petroleum fuel oil, imported from the Netherlands West Indies on October 27, 1951, was assessed with a tax of ½ cent per gallon upon entry into the United States in accordance with the provisions of section 3422 of the Internal Revenue Code [26 U. S. C. sec. 3422]. Protesting this action, the importers sought entry at ¼ cent per gallon, the rate of tax concededly applicable should said imposition under section 3422, *supra,* be without proper legal foundation. The United States Customs Court, First Division, sustained the importers' protest, *Metropolitan Petroleum Corp., Herbert B. Moller* v. *United States,* Vol. 88, Treas. Dec. (advance reports of October 15, 1953), C. D. 1547, and the United States seeks herein a reversal of the judgment rendered pursuant to such decision.

The undisputed sequence of events preceding the imposition of the tax in question was concisely set forth in the opinion of the lower court as follows:

"In a series of revenue acts, ultimately codified as part of the Internal Revenue Code (26 U. S. C.), Congress imposed a tax upon imported crude petroleum and certain petroleum products, including fuel oil derived from petroleum, of ½ cent per gallon (26 U. S. C. sections 3420–3422). The Tariff Act of 1930 was amended by the so-called Reciprocal Trade Agreements Act of 1934 (48 Stat. 943; 19 U. S. C. sections 1351–1354), which added section 350 thereto, and, among other things, authorized the President to enter into trade agreements with foreign governments and to proclaim the rates necessary to put such agreements into effect, limiting such changes in duties, however, to 50 per centum of the rates in effect when the law was passed. The President was also authorized to terminate any such proclamation at any time in whole or in part.

"By trade agreement with Venezuela, the President agreed to reduce the tax, among other things, on imports of petroleum and petroleum products, including fuel oil derived from petroleum, which equaled 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year. This reduced rate was made effective on December 16, 1939, by Presidential proclamation (54 Stat. 2402; 75 Treas. Dec. 165, T. D. 50015). The tax on petroleum and products imported in excess of the foregoing tariff quota was left at the statutory rate of ½ cent per gallon.

"Thereafter, the President, by trade agreement with Mexico, agreed to reduce the import tax on petroleum and certain specified petroleum products enumerated in section 3422 of the Internal Revenue Code, including fuel oil derived from petroleum, to ¼ cent per gallon. Proclamations executing this undertaking were published and became effective on January 30, 1943 (57 Stat. 833–909; 78 Treas. Dec. 190–206, T. D. 50797). No tariff quota or other limitation was made in connection with the rate of ¼ cent per gallon under the Mexican Trade Agreement, and it, therefore, applied to all imported merchandise of that description.

"The act of July 5, 1945 (59 Stat. 410) provided, among other things, that the second sentence of section 350 (a) (2) of the Tariff Act of 1930, as amended by the Reciprocal Trade Agreements Act, *supra*, be amended to read as follows:

No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, however established, existing on January 1, 1945 (even though temporarily suspended by Act of Congress), or transferring any article between the dutiable and free lists.

"The rate of tax or duty of ¼ cent per gallon fixed by proclamation pursuant to the Mexican Trade Agreement was still in effect on January 1, 1945, and was likewise unchanged by the Presidential proclamation which followed the General Agreement on Tariffs and

Trade (61 Stat. 1103; 82 Treas. Dec. 305, T. D. 51802), which continued the reduction in the tax on topped crude petroleum and fuel oil derived from petroleum, but tied the rate applicable thereto to the rate of tax applicable to crude petroleum.

"On September 6, 1950, the President issued Proclamation No. 2901, effective January 1, 1951 (64 Stat. A 427; 85 Treas. Dec. 252, T. D. 52559), the purpose of which was stated to be, among other things, to make certain changes in existing rates of duty that were required or appropriate to carry out the provisions of the General Agreement on Tariffs and Trade and the Venezuelan Trade Agreement. * * *

"In its recitals, the proclamation states that the rates of duty agreed to in the trade agreement with Mexico had been effectuated by earlier proclamations of December 28, 1942, and December 31, 1942, respectively, and that thereafter the parties in question had agreed that said trade agreement with Mexico should cease to be effective after December 31, 1950. It recites further than an earlier trade agreement had been entered into between the United States and Venezuela, effective December 14, 1940, that had fixed a duty of ¼ cent per gallon on a limited quantity of crude petroleum and certain petroleum products, including fuel oil derived from petroleum. The balance remained taxable at the statutory rate of ½ cent per gallon. The proclamation then refers to the treatment of, among other things, fuel oil derived from petroleum, which had been accorded by the General Agreement on Tariffs and Trade.

"Having thus recited the various actions which had theretofore been taken with respect to petroleum and petroleum products, the determination of the President is set forth in the sixteenth recital as follows:

16. Whereas I determine that it is required or appropriate to carry out the said trade agreements specified in the first and twelfth recitals of this proclamation on and after January 1, 1951, that crude petroleum, topped crude petroleum, and fuel oil derived from petroleum, including fuel oil known as gas oil, entered, or withdrawn from warehouse, for consumption in any calendar year in excess of an aggregate quantity of all such products equal to 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year, as provided in said item 3422 set forth in the thirteenth recital of this proclamation shall be subject to import tax at the rate of ½¢ per gallon;"

The trade agreement specified in the first recital was the General Agreement on Tariffs and Trade, and the twelfth recital has reference to the Trade Agreement with Venezuela. The President then proclaimed as follows:

PART I

\*     \*     \*     \*     \*     \*     \*

(b) The said proclamations of December 28 and 31, 1942, relating to the said

trade agreement with the United Mexican States, shall be terminated in whole as of the close of December 31, 1950.

*　　*　　*　　*　　*　　*　　*

PART IV

To the end that the said trade agreements specified in the first and twelfth recitals of this proclamation may be carried out, crude petroleum, topped crude petroleum, and fuel oil derived from petroleum, including fuel oil known as gas oil, entered, or withdrawn from warehouse, for consumption in any calendar year beginning with the calendar year 1951, in excess of an aggregate quantity of all such products equal to 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States during the preceding calendar year, specified in the said item 3422 set forth in the thirteenth recital of this proclamation, shall be subject to import tax at the rate of ½ cent per gallon.

In the light of the foregoing, the court held that Proclamation No. 2901, *supra*, issued by the President of the United States terminating the Mexican Trade Agreement, should be construed as having increased the rate of internal revenue tax on imported fuel oil derived from petroleum more than 50 per cent above the rate of tax imposed on such fuel oil on January 1, 1945, and therefore in violation of section 350, as amended, *supra*. In so finding, the court was, as stated in its opinion, "impressed by the fact, apparent from the above-quoted excerpts, that there were no implicit assumptions that the mere termination of the proclamation relating to the trade agreement with Mexico automatically restored the rates proclaimed for crude petroleum pursuant to the trade agreement with Venezuela." The court took the further position that an affirmative executive act had proclaimed the Mexican Trade Agreement and suspended the rates proclaimed pursuant to the Venezuelan Trade Agreement, and "an affirmative executive act was deemed 'required or appropriate' to restore the application of such rates."

It is recognized from the foregoing that but for the President's Proclamation No. 2901 terminating the Trade Agreement with Mexico the issue before us could not be raised. The determinative question—in fact, the controlling if not only issue in the case—is whether the rate of tax applicable to petroleum products, such as that at bar, was increased beyond the 50 per cent limit laid down by Congress in section 350, as amended, *supra*, as a result of the proclamation to which we have herein referred.

Although section 350 of the Tariff Act of 1930, as amended, has been referred to in some detail, *supra*, its pertinent provisions are deemed to be of such critical importance in this proceeding as to justify the following more specific reporting of its terms:

(a) * * * the President * * * is authorized from time to time—

(1) to enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

(2) to proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign-trade agreements, as are required or appropriate to carry out any foreign-trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, however established, existing on January 1, 1945 (even though temporarily suspended by Act of Congress), or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided*, That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts * * * or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part.

There can be no dispute of the fact that said section 350, as amended, *supra*, clearly prohibits the President from increasing or decreasing by more than 50 per cent any rate of duty, however established, which existed on January 1, 1945. It is conceded that the only lawful rate of tax for fuel oil such as that at bar on January 1, 1945 was the rate provided by the Mexican Trade Agreement of ¼ cent per gallon, and that the increase to ½ cent per gallon resulted in a 100 per cent increase of such rate.

The Government contends, and presents as the main basis for its argument before us, that the action of the President in proclaiming the termination of the Mexican Trade Agreement did not require any reference therein to the Trade Agreement with Venezuela vital to these proceedings, the pertinent portions of which have been set forth in this opinion, *supra;* also, that the declaration by the President as to the rate applicable to imports from Venezuela was unnecessary and was merely included, presumably as a guide, for those whose duty it was to carry out the law relating to our trade agreement program. In essence, therefore, the Government's argument is directed to the proposition that the proclamation terminating the Mexican Agreement had the effect of restoring, by operation of law, the rate of tax which was applicable immediately prior to the effective date of the trade agreement so terminated. In this respect, it is argued that, despite the fact that such restored rate of tax was more than 50 per cent higher than the rate in effect on January 1, 1945, the President acted within his authority under section 350, as amended, *supra*, regardless of whether or not the said proclamation recited a new rate.

It is the position of the appellee that the language of section 350, as amended, *supra*, clearly states that no proclamation may be made which increases by more than 50 per cent the rate of duty existing on January 1, 1945. As the proclamation in question violates such

prohibition by increasing the rate by 100 per cent, according to appellees' view, it is void and without legal effect. It is the further position of the appellees that of the two types of proclamations that may be issued by the President under section 350, as amended, *supra*, i. e., those carrying out modified rates of duty under trade agreements and, secondly, those terminating earlier proclamations, Proclamation No. 2901, here under consideration, is a clear instance, by its very terms, of a proclamation in the first category.

The lower court strongly supported the view that when Congress passed the Act of July 5, 1945 (amending section 350, *supra*) containing the 50 per cent prohibition against proclamations increasing or decreasing any rate of tax, however established and existing on January 1, 1945, it was intended that the document or vehicle used by the President, both in putting into effect modifications of existing duties and in terminating the same, should be defined as a proclamation.

Careful reading and study of the history of our trade agreement program and the painstaking effort manifested by Congress, as found in the debates and other literature on the subject, leaves a clear result which we think should be free from any serious doubt or criticism. Preliminary to the grant by Congress of authority to the President to enter into trade agreements with foreign countries for the reciprocal reduction of tariffs and other barriers to the flow of international trade, the United States, as well as other countries, had suffered from a severe economic crisis. The President requested trade agreement authority as part of a program necessitated by such crisis. The original authority to make trade agreements, as granted to the President by Congress, was limited to a three year period and thereafter extended from time to time. No rehearsal of the tremendous power delegated by Congress to the Executive is needed for one to appreciate the reason for the legislation providing, in a most detailed fashion, the step by step procedure which was deemed advisable and necessary for the Executive to follow should presidential action be contemplated. It was mandatory that the President seek information and advice with respect thereto from the United States Tariff Commission, the Departments of State, Agriculture, and Commerce, and from such other sources as he would deem appropriate. The reports of the United States Tariff Commission set forth in interesting detail the history of the trade agreement program and the administrative organization and procedure functioning thereunder for the benefit of the Executive in carrying out the duties devolving upon him when the law is to be invoked. To some extent, this chronology of the procedure that was thus to be followed finds support in those reports. For instance, the information made available to the President, as heretofore set forth, was further augmented by the establishment of a Com-

mittee on Trade Agreements. The membership of that committee, which also had authority to recommend to the President specific trade agreements, consisted of a Commissioner from the United States Tariff Commission and persons designated for their respective agencies by the Secretaries of State, Treasury, War, Navy, Agriculture, Commerce, and Labor. Whenever a prospective trade agreement is under active consideration by this committee, a separate committee for the particular country or countries concerned is created which has the duty of analyzing the mass of information supplied by different agencies in order to present specific recommendations to the Committee on Trade Agreements.

Under this program, the President created a Committee for Reciprocity Information which provided, among other things, reasonable public notice of intention to negotiate in order that any interested persons might have an opportunity to present their views. The procedure to be followed in negotiating such agreements is provided in great detail.

Many separate trade agreements, including the agreements with Venezuela and Mexico, herein discussed, have been concluded under this authority since the Trade Agreements Act of 1934 went into effect.

It is clearly provided, as to the content of trade agreements, that they consist of two main parts; first, a series of so-called general provisions and, secondly, two or more schedules enumerating the articles on which the specified concessions are to be granted by the United States and the foreign country or countries. The general provisions deal with procedural matters such as the time when the agreement is to become effective, the areas intended to be covered, how and when the agreement may be terminated, and various other matters relative to the agreement as a whole.

Complete reports are made by the Tariff Commission to Congress, especially to the appropriate committees of the Senate and House of Representatives, at least as often as once a year in which a factual account of the operation of the trade agreements program is submitted. Such reports, when in the form of executed treaties, are published in the United States Statutes at Large.

While the foregoing is not decisive of any issue herein involved, it discloses what the delegation to the Executive involved and how careful Congress was in providing for its execution.

The provisions of the Trade Agreements Act, its effect in various operations since enactment, and the purposes Congress had in mind in enacting the same have been before us on several occasions. While such litigation presented issues somewhat remotely associated with the subject herein discussed, nevertheless there is displayed therein a broad knowledge of the basic principles governing our trade agreement

policy and the law in support thereof. A mere reading of the decisions in the following cases will convince one of the propriety of this statement. *George G. Wislar* v. *United States*, 26 C. C. P. A. (Customs) 138, C. A. D. 7; *Ernest E. Marks Co.* v. *United States*, 28 C. C. P. A. (Customs) 286, C. A. D. 156; and *Greene Cattle Company, Inc.* v. *United States*, 36 C. C. P. A. (Customs) 52, C. A. D. 397.

We think it is clear that in meeting the issue herein before us it is most reasonable to impute to Congress, without any expression therefrom at the time it passed the amendment to the Tariff Act of 1930 dealing with the 50 per cent prohibition in question, knowledge of the fact that the Venezuelan Trade Agreement had been executed and was in full force and effect, except for the fact that the particular rate on fuel oil therein specified had been suspended temporarily under the provisions of the Mexican Trade Agreement, and that but for the existence of the Mexican Agreement the instant importation would have admittedly been subject to the tax of not more than ½ cent per gallon.

We make this observation: The trade agreement between the United States and Venezuela ran the gamut, in all its ramifying details, and became a solemn binding document between the two countries. To contend, as the appellees do, that the provisions thereof, antedating as indicated the amendment to the Tariff Act of 1930 in question, should not apply because the Executive saw fit to insert a provision in the terminating proclamation affecting the Mexican Trade Agreement construing the future tariff status of fuel oil under the Venezuelan Agreement (see the sixteenth recital of the proclamation under consideration, *supra*), is a view we cannot support. We are convinced that it is entirely proper to charge Congress with knowledge, not only of the fact that the Venezuelan Trade Agreement existed, but also that it would continue to exist until it was itself terminated appropriately through the well recognized procedure covering such cases, i. e., that Venezuela, if she cared to under the provisions of the agreement, would initiate a move in that direction, just as the United States might do. To say, however, that an agreement, such as was the Mexican document, upon its termination could be the vehicle to do indirectly that which we think the Venezuelan Trade Agreement required to be done directly is without support in reason or logic. It would possibly have been the better course for the document terminating the Mexican Trade Agreement to have omitted the reference to the Venezuelan Trade Agreement and thereby subject the importation in question admittedly to the provisions of the Venezuelan Agreement, which would have been in effect automatically following its temporary suspension under the Mexican Agreement. We respect, recognize, and sustain the Venezuelan Agreement as being fully effective upon the termination of the Mexican Agreement, regardless of anything that

might be inferred to the contrary from what was set forth by the Executive in the terminating proclamation.

In discussing Part IV of Proclamation No. 2901, *supra*, and its effect on the Trade Agreement with Venezuela, the appellant, in its brief, has commented as follows:

It is true that Part IV of Proclamation 2901 states, in effect, that it was being issued, at least in part, for the purpose of carrying out the trade agreement specified in the first and twelfth recital of that proclamation, i. e., the trade agreement with Venezuela and the General Agreement on Tariffs and Trade. *But that statement was merely declaratory of what the law was without it,* for a previous proclamation had been issued by the President, which carried the Venezuelan Agreement into effect * * *. *No other was necessary.* When the proclamation which carried the Mexican Agreement into effect * * * was subsequently issued, it superseded the proclamation of the Venezuelan Agreement with respect to fuel oil, because the rate in the Mexican Agreement was lower, but it did not have the effect of terminating the relevant provision of the Venezuelan Agreement or the proclamation which carried it into effect.

The Venezuelan Agreement and proclamation remained in force, although their effectiveness to fix the rate on fuel oil in excess of the tariff quota was superseded by the proclamation of the Mexican Trade Agreement giving effect to a still lower rate on fuel oil in that agreement. Consequently, when the Mexican Agreement was terminated, *the rate in the proclamation of the Venezuelan Agreement * * * again became operative with respect to over-quota fuel oil by force of law alone, and it needed no legislative action or proclamation to restore its not defunct but merely dormant rate to effectiveness.* In the circumstances, the part of Proclamation No. 2901 which purported to carry out the Venezuelan Agreement and the General Agreement was redundant, and it cannot, therefore, be properly considered as having been intended to be a legally effective part of the power exercised by the President in terminating the Mexican Trade Agreement Proclamation. [Italics ours.]

That we are in entire agreement with the foregoing is manifest from the view we have heretofore expressed herein.

For the reasons hereinbefore stated, the judgment of the United States Customs Court is *reversed.*

GARRETT, Chief Judge, was present at the argument of this case, but, by reason of illness, did not participate in the decision.

---

WORLEY, Judge, dissenting.

My disagreement with the majority is based on the following language in sec. 350 (a) (2) of the Tariff Act of 1930, as amended:

*No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, however established, existing on January 1, 1945* (even though temporarily suspended by Act of Congress), or transferring any article between the dutiable and free lists. (Italics supplied.)

I am in complete accord with the conclusion of the Customs Court, as so ably expressed in its opinion, that the instant increase in duty is void.